## ELI CANN, Appellant, *v.* GEORGE B. WILLIAMS LAND AND LIVESTOCK COMPANY, a Corporation, Respondent.

No. 3192

December 10, 1938.                                      85 P.(2d) 63.

*Brown & Belford* and *A. L. Haight,* for Appellant:

*Platt & Sinai,* for Respondent:

## OPINION

By the Court, TABER, J.:

Appellant and respondent were, respectively, plaintiff and defendant in the court below. In January 1932, in the Eighth (now the First) judicial district court, Churchill County, plaintiff recovered a default money judgment on a promissory note against George B. Williams and M. Genevieve Williams in the sum of $12,498.26, with interest and costs.

Pursuant to a writ of execution issued out of said district court, the sheriff, on April 19, 1932, levied upon and sold to plaintiff, amongst other property, five shares of the capital stock of defendant company belonging to said George B. Williams, and seven shares of such capital stock belonging to said M. Genevieve Williams. On May 18, 1932, pursuant to said writ of execution, the sheriff further levied upon and sold to plaintiff, for $7,250, all the right, title and interest of said judgment debtors in and to: (a) A further 1,350 shares of the capital stock of defendant corporation, represented by certificate No. 6; (b) 617 shares of such capital stock standing in the name of M. Genevieve Penrose on the records of said corporation; (c) 586 shares of such capital stock standing in the name of Alice E. Biane on said records; (d) 65 shares of such capital stock standing on said records in the name of Ward Stanley Williams.

Between the dates of said execution sales, plaintiff instituted proceedings supplementary to execution, in the course of which said judgment debtors appeared and answered upon oath concerning their property. On May 31, 1932, plaintiff demanded of said George B. Williams as president, and said M. Genevieve Williams as secretary, of defendant corporation that 1,362 shares of the capital stock be transferred to him—being the said 5, 7 and 1,350 shares hereinbefore mentioned. Said judgment debtors did not comply with said demand.

On January 8, 1932, plaintiff commenced this action, alleging the conversion by defendant corporation of said

1,362 shares of its capital stock. At the trial in November 1932, defendant, at the conclusion of plaintiff's case in chief, moved for a nonsuit. On this motion the court reserved its decision and requested counsel for defendant to go on with the case. Defendant thereupon called three witnesses and, after they had given their testimony, rested and renewed its motion for nonsuit. This motion was later granted and the action dismissed. From the judgment, and from an order denying a motion for new trial, plaintiff appealed to this court, which reversed the case and ordered a new trial upon the ground that plaintiff had made out a prima facie case in the district court.

By stipulation of the parties the case was transferred to the Second judicial district court, Washoe County, where a second trial was had by the court, without a jury, in April 1936. At this trial the testimony and documentary evidence given and adduced at the first trial were admitted in evidence by agreement of the parties, and each party, pursuant to a further stipulation, then proceeded to offer additional testimony and evidence. The second trial resulted in a judgment for plaintiff against defendant in the sum of $260.88, the value of said 5 and 7 shares of capital stock, with interest in the amount of $75.36, and costs. Plaintiff moved for a new trial, which was denied, and then appealed to this court, basing his appeal upon the trial court's failure to award him damages for the alleged conversion of said 1,350 shares. There is no contention as to said 5 and 7 shares which defendant admits belonged to Mr. and Mrs. Williams, respectively, at the time of the first levy and sale. At the second trial, and on this appeal, the controversy centers wholly around the 1,350 shares. Appellant claims that these shares were the property of George B. Williams at the times of both levies and sales on execution, while respondent contends that they belonged, at said times, to defendant corporation.

The position taken by respondent is based entirely upon the alleged transfer by George B. Williams to

defendant corporation, on November 8, 1927, of 1,621 shares of capital stock evidenced by certificate No. 6, and including the 1,350 shares in controversy. Appellant maintains that no such transfer was made; and furthermore, if any such purported transfer was made at said or any other time, it was wholly void, because it was made with intent to defraud the creditors of said George B. Williams, and in particular with the intent to defraud appellant. The trial court found that at the time of the levies and sales on execution said 1,350 shares did not belong to George B. Williams, and in its written decision held that at the time of the levy on said 1,350 shares they were the property of respondent, that said alleged transfer by George B. Williams to respondent was in fact made, that the surrender by said George B. Williams of 1,350 shares to the corporation for the discharge of a debt and with the view of reducing the amount and enhancing the value of the outstanding shares was ratified by the stockholders, and that said transfer was for a valuable consideration and without intent to hinder, delay, or defraud creditors.

Appellant assigns as errors: "1. That the finding and decision of the district court that the 1350 shares of stock attempted to be sold by the sheriff and which plaintiff claimed belonged to George B. Williams did not in fact belong to him and that the officers of the defendant corporation rightfully refused plaintiff's demand that the said 1350 shares be issued to plaintiff, was not supported by the evidence and was contrary to the evidence; 2. That the district court erred in refusing to hold that plaintiff, by purchase at the execution sale, had become the owner of 1,362 shares of defendant corporation; 3. That the district court erred in refusing to grant plaintiff judgment for the conversion of said 1,350 shares in addition to the 12 shares for which judgment was given; 4. That, in refusing to grant judgment to plaintiff for the conversion of said 1,350 shares, the decision of the court was against the law; and 5. That the court erred in refusing to grant plaintiff a new trial."

George B. Williams Land and Livestock Company was incorporated in 1917, with a capitalization of 3,000 shares, each of the par value of $100. On September 6 of that year certificate No. 1, for 300 shares, was issued to Eugene L. Williams, No. 2, for 2,153 shares, to George B. Williams, and No. 3, for 267 shares, to Frank M. Hoy. George B. Williams was president of the company, and Hoy its first secretary. On October 8 of the same year, George B. Williams transferred 32 shares to his wife, M. Genevieve Williams. His remaining 2,121 shares, evidenced by certificate No. 4, were, on February 25, 1918, split up into three blocks, issued to himself as follows: Certificate No. 6, 1,621 shares, No. 7, 250 shares, and No. 8, 250 shares. On February 19, 1927 he acquired a further 200 shares, transferred from certificate No. 1, making a total of 2,321 shares standing in his name until November 8, 1927, according to the copy of the stock record furnished plaintiff by Mr. Sinai in 1932 (plaintiff's exhibit No. 5). On November 8, 1927, according to the stock book as read into the record by plaintiff's counsel, George B. Williams acquired a further 267 shares, transferred from Hoy certificates 11 and 12.

We now proceed to inquire into what respondent claims transpired on November 8, 1927, and on the 3d of the following month, relative to the 1,621 shares evidenced by certificate No. 6. M. Genevieve Williams, wife of George B. Williams, testifying at the second trial, was shown said certificate and its stub. On the certificate itself was written, in red ink and in longhand, "Cancelled 11/8/27 in pay't of $135,000 debt. See certificate No. 16." On the stub there was also written in red ink, "Cancelled, See Certificate No. 16." At the first trial, when George B. Williams was on the stand, counsel for plaintiff, referring to said stub, said: "And on the stub it says that it is transferred from George B. Williams. Original certificate No. 4; original number shares 2121; number transferred 1621. See certificate No. 16." Mrs. Williams, at the second trial, testified that the red ink cancelations on said certificate

and stub were in her handwriting, and that they were written by her on November 8, 1927. She further testified that there was a meeting of the corporation on December 3, 1927, at which there were present her husband, her daughter M. Genevieve Penrose, her son Ward Stanley Williams, plaintiff, and herself; that plaintiff took minutes of the meeting, but that when "we" looked for them later they were not in the minute book; that the stock certificate book was at said meeting, and that plaintiff saw it at that time, and saw certificate No. 6 and stub No. 6; that the matter of the cancelation of said certificate No. 6 was discussed at said meeting with plaintiff, that "we" asked him if it was correct and according to the advice he had given George B. Williams, and that he said it was and should stand approved— that it was all right, that witness (Mrs. Williams) had canceled the stock correctly, and that "that would be the way he would advise that it should be cancelled for the purpose"; that George B. Williams kept 271 of said 1,621 shares, and the rest (1,350 shares) was to go back to the corporation, to be used later as defendant should see fit; that the principal reason for calling this meeting was to discuss the matter of turning said stock back to the corporation; that the officers and directors discussed just what should be done or could be done, and it was considered and approved that the best thing that could be done was to cancel a certain amount or number of shares; that plaintiff advised that such was the wisest and best way to do it; that a certain part went back to George B. Williams, which was agreeable, and that the balance was to go back to the corporation, to be used later "in any way that might come up"; that such was the advice given by plaintiff, so understood by the officers and stockholders, all of whom were present, and that said procedure was acceptable to all the stockholders. She also testified that she remembered her husband wanted to have this meeting so he could see what he could do, after a sale which had been made to Mr.

Moffatt, to keep the stock as nearly at par value as possible. M. Genevieve Penrose, at the second trial, gave substantially the same testimony as her mother regarding the alleged meeting of December 3, and they both gave similar testimony at the first trial, though it appears that there was no testimony at the first trial as to when the notations were made on certificate No. 6 and its stub, nor any testimony as to who made the notations. George B. Williams also gave some testimony at the first trial relating to the alleged cancelation of certificate No. 6 in November 1927 and the corporation meeting in December of that year. Ward Stanley Williams died before the second trial.

Respondent admits that no certificate for the 1,350 shares was issued, and that no record of a transfer of the 1,621 shares to the treasury of the company was made in the stock book. But it maintains that it was the intention of George B. Williams, with the knowledge and approval of the corporation and of plaintiff, to turn back into the treasury 1,350 of said 1,621 shares, retaining the remainder of them, and that in order to carry this out, it was decided to cancel certificate No. 6, and at the same time issue a new certificate, No. 16, to George B. Williams for 271 shares. In the stock book, said certificate No. 16 for 271 shares to George B. Williams, dated November 8, 1927, is marked: "Cancelled June 30th, 231 shares transferred to M. Genevieve Williams. See certificate No. 28." The stub of said certificate No. 16 shows: "Transferred from George B. Williams; original certificate 6; number of original shares 1621; number of shares transferred 271." This stub also has the annotation, "Cancelled. See certificate No. 28." In the copy of the stock book furnished plaintiff by Mr. Sinai in 1932, we find that certificate No. 16, for 271 shares, was issued to George B. Williams on November 8, 1927 in lieu of certificate No. 6 for 1,621 shares. Respondent argues that this entry tends to corroborate its witnesses regarding the turning back to

the corporation by George B. Williams of the 1,350 shares because, with the single exception of certificate No. 6, whenever a certificate was split up the stock record shows that all stock evidenced by such certificate was transferred to one or more individuals—every share was accounted for. This is further proof, argues respondent, that it was the intention of Mr. Williams and the corporation that the 1,350 shares were to go back into the company's treasury. As against appellant's contention that the pretended cancelation of certificate No. 6 did not take place until about the time the supplementary proceedings were instituted in 1932, respondent points to the fact that when George B. Williams surrendered certificate No. 6 to the corporation, he endorsed it in blank, and that his endorsement was witnessed by his brother Eugene, who died in the year 1930.

Appellant contends that certificate No. 6 was not canceled on November 8, 1927, and that it was only when members of the Williams family were called into court in 1932 on supplementary proceedings that the attempted cancelation came into existence; that the alleged cancelation on November 8, 1927, was not discussed, approved, or ratified at the alleged corporation meeting on December 3, 1927, and that no such meeting was in fact held. He denies that he attended any corporation meeting on December 3, 1927, and denies that at that or any other time he ever discussed, advised, or approved of the alleged cancelation of certificate No. 6. He testified that he did not learn of the purported cancelation until the hearing on said supplementary proceedings.

Prior to the supplementary proceedings plaintiff, both as creditor and stockholder, demanded that he be shown the stock book, but his demands were not complied with. He was furnished with what purported to be a list of all the stock issued, including the parties to whom the same was issued, the date of issuance, and the transfers. Appellant points out that while this list shows other

certificates to have been canceled, it does not show that No. 6 was canceled. Except for the verbal testimony of members of the Williams family, there is nothing to show that this alleged cancelation was ever ratified. No minutes of any corporation meeting in December 1927 have been produced. No other meeting was held until September 18, 1930, when Mr. Sinai was present; and he wrote up the minutes, which show approval of the sale of land and sheep to the Moffatt Company, but nothing whatever concerning the alleged cancelation of certificate No. 6, which would also certainly be considered a major transaction. Mrs. Williams testified that plaintiff, at the meeting on December 3, 1927, wrote up the minutes in longhand, but later it was found that no minutes of this meeting had been written or typed in the minute book. This is the reason advanced by defendant for holding the meeting of September 1930. We have already seen that appellant denies having attended any meeting of the corporation in December 1927. He argues that if there had in fact been such a meeting, and the sale to the Moffatt Company and the cancelation of certificate No. 6 had been acted on at that meeting, Mrs. Williams, as secretary of defendant corporation, would have insisted upon the minutes being written up in the minute book, so as to show the ratification of both transactions. The fact that the minutes of the meeting of September 18, 1930, made no mention whatever of the alleged cancelation of certificate No. 6, indicates very strongly, according to appellant, either that no meeting of the company was held on December 3, 1927, or that the alleged cancelation of said certificate was not acted on at that time. It is true the stock book says that certificate No. 16, for 271 shares, was reissued on said 8th day of November 1927, out of the 1,621 shares, certificate No. 6; but appellant maintains that this is still another fact going to show that said certificate was not canceled, as 271 shares could not have been sold out of stock that had been canceled.

Members of the Williams family testified that plaintiff

had been one of defendant's attorneys most of the time since the company was organized. Plaintiff testified that he had never been its attorney, but only its resident agent. Defendant introduced in evidence a receipted bill for legal services rendered by plaintiff to defendant. This statement was for "legal services rendered 1927— $180.00." Defendant's evidence convinced the trial court that plaintiff was consulted from time to time on legal matters relating to the corporation, and that he gave some direction in relation to the cancelation of the 1,350 shares.

On the first trial, Mrs. Penrose testified that the meeting of December 3, 1927, was a special meeting held to "verify" the sale of land and sheep to the Moffatt Company; on the second trial, Mrs. Williams testified that the principal reason for calling that meeting was to take up the matter of her husband's turning back to defendant corporation the 1,350 shares of stock included in certificate No. 6.

■ We have not detailed all the evidence relating to the alleged turning back, by George B. Williams, of 1,350 shares to the treasury of the corporation, and the alleged meeting of December 3, 1927; but the leading facts and circumstances relied upon by the respective parties have been referred to. There is a sharp and substantial conflict in the evidence, and the trial court, after weighing and considering the evidence and the credibility of the witnesses, found that the transactions and happenings of November 8, 1927, and December 3, 1927, were substantially as testified to by plaintiff's witnesses. While there is some doubt in our minds as to the correctness of these findings, we are unable to say, after studying the record, that it is clear they are not supported by the evidence; hence we cannot set them aside.

■ There remains, however, the question whether the aforesaid transfer was void because made with intent to defraud, or under such circumstances as to constitute a fraud, upon the creditors of George B. Williams, and in particular the plaintiff.

Members of the Williams family testified that certificate No. 6 was canceled on November 8, 1927, with the intent of all the officers and directors of the company, acting upon plaintiff's advice, that 1,350 of the 1,621 shares evidenced by that certificate should revert to the treasury of the corporation, the remaining 271 shares being retained by George B. Williams, for which certificate No. 16 was issued to him.

George B. Williams testified that he borrowed considerable sums of money from the company, and when asked what such moneys were used for, he stated that he spent a great deal of it in mines and lost money in the bank, also in oil wells; that he lost a great deal of money; that he owed the Churchill County Bank $40,000, and had to borrow from the Wingfield Bank to pay the Churchill County Bank. "Sometimes I would owe money and go and borrow it, and it ran up to one hundred thirty-five thousand dollars." He testified that he didn't know how much he spent on his own personal affairs, but that he figured he owed the company $135,000, and that by canceling that amount of corporation stock it put him back even with the company. He testified that he paid $20,000 for bank stock; that he spent about $35,000 on the Peterson ranch, and from $5,000 to $6,000 on the Moore ranch; that he lost about $4,000 mining in Broken Hills. Sometimes, according to Mr. William's testimony, the corporation would run short of money and he would borrow some and put it in the bank account and give his note for it. He testified that when his brother Eugene L. Williams drew out of the corporation he, George B. Williams, put in the Eastgate ranch to make up what was drawn out by his brother—approximately $30,000; and that when he bought out Mr. Hoy, he borrowed $21,000 for that purpose. To a large extent, George B. Williams failed to keep separate his personal financial affairs and those of the corporation, at times using his own money for corporation purposes and at other times using the company

money for himself. All this was done, however, according to his testimony, with the full consent of all the other stockholders. The record shows that plaintiff used company checks in making certain payments to plaintiff on account of personal indebtedness.

As against the foregoing, appellant contends that the indebtedness for which defendant claims George B. Williams turned 1,350 shares back into the company's treasury, was a debt of the corporation, not of George B. Williams, and that it was recognized as a corporation debt by all parties concerned. That the indebtedness was that of the corporation, not that of Mr. Williams, is proved, says appellant, by the canceled promissory notes and other written evidence furnished by Mr. Williams himself at the first trial. It further appears from the record that the indebtedness to The Reno National Bank was treated as a corporate debt for income tax purposes. Furthermore, appellant maintains that the amount of the indebtedness was in fact less than $135,000—a fact which is proved not only by George B. William's own testimony, "as near as I can remember it was one hundred eighteen thousand dollars I owed in the fall and I paid it," but also by defendant's exhibit A, a letter from the cashier of The Reno National Bank in words and figures as follows:

"The Reno National Bank
"Capital $700,000.00
"Geo. Wingfield, President

"J. G. Taylor                              J. Sheehan
   Vice President                        Vice President
              "H. H. Kennedy Cashier
"P. L. Nelson,                        A. R. McRae
   Asst. Cashier                       Asst. Cashier
                              "Reno, Nevada
                              "October 19, 1927.

"Geo. B. Williams Land & Livestock Co.,
"Fallon, Nevada.
"Gentlemen:
"We have received and credited to your account three

checks aggregating $118,182.52, and have charged your account with the following notes:

| | |
|---|---:|
| Dated December 7, 1925 | $31,000.00 |
| "        "        "        " | 20,000.00 |
| "        "   18   " | 7,485.54 |
| "   February 2, 1926 | 11,000.00 |
| "   January 24, 1927 | 5,000.00 |
| "   December 31, 1925 | 35,000.00 |
| Interest on the above from June 30th to Oct. 18th | 2,627.75 |
| Dated April 22, 1927 | |
| Int. from June 30th | 120.00 |
| | $117,233.29 |

"The last mentioned note is held by one of the other banks, and will be returned to you within a few days. The balance of the notes are canceled and enclosed herewith accompanied by the following shares of the capital stock of your company:

| | | |
|---|---|---:|
| Certificate No. | 6 | 1621 shrs. |
| "        No. | 7 | 250 " |
| "        No. | 8 | 250 " |
| "        No. | 11 | 67 " |
| "        No. | 12 | 200 " |

"Please acknowledge receipt on the enclosed copy of this letter.

"Yours very truly,
"H. H. Kennedy Cashier."

George B. Williams and the defendant, argues appellant, simply attempted to dispose of the 1,350 shares by estimating the value of the stock at $100 per share—1,350 shares equaling $135,000. When George B. Williams was asked at the hearing in the supplementary proceedings in 1932, "What does this entry on the stock certificate mean, it was canceled in payment of one hundred thirty-five thousand dollar debt?", he replied, "I don't know, I can't understand that myself."

Appellant makes the further contention that all the indebtedness due The Reno National Bank in October

1927 arose and gradually accumulated after October 24, 1922, at which time there was no indebtedness to said bank, either on the part of Mr. Williams or the corporation. Appellant asserts that, with the possible exception of the money paid to Mr. Hoy for his stock, Mr. Williams in his testimony did not recite a single purpose for which he used the corporation's money for his own benefit after October 24, 1922. "It seems incredible," say counsel, "that Mr. Williams could have incurred an indebtedness of more than $109,000, exclusive of interest, between December 30, 1922, and October 19, 1927, and not be able to recall a single use to which any of the money was put (with the exception of the Hoy deal) while, on the other hand, the only things that he could recall, such as the oil stocks, Churchill County Bank loss (which was really but a sale for a sum less than the original cost many years before), the purchase and improvement of the Peterson ranch, the purchase and improvement of the Eastgate ranch, etc., all occurred many years previously to the date this indebtedness to The Reno National Bank actually commenced—December 30, 1922—and formed the basis for the old indebtedness to the Churchill County Bank." Appellant directs attention also to dividends dispersed by the corporation, practically in their entirety, to Mr. Williams, including one in the sum of $28,914.96 and another for $27,300. There is also the testimony of Mr. Williams himself that annually, for some years at least, "We were selling over one hundred thousand dollars, some years more than that."

Appellant points out that the 1,350 shares were never entered on the books of the corporation, nor was a certificate ever issued for them. Moreover, argues appellant, there was no occasion for retiring any part of said 1,350 shares on or about November 8, 1927, for the reason that the corporation's net worth was as much then as it had been before the Moffatt sale, the proceeds of which discharged The Reno National Bank indebtedness. Appellant quotes respondent's counsel: "There was no

particular need to cancel Certificate No. 6 except for the fact that the stockholders felt that this stock should go back to the corporation to cancel the debt which Mr. Williams owed the corporation." But, says appellant, as there was no debt, so there was no need for retiring the 1,350 shares.

There is one important matter concerning which appellant and respondent differ widely, and that is whether George B. Williams was rendered insolvent by reason of his turning the 1,350 shares included in certificate No. 6 back to the corporation. It is not claimed that the debtor was insolvent before these shares were turned back to the corporation; but appellant contends that by reason of said transaction, and because of other transfers made during the week preceding Christmas of 1927, Mr. Williams was rendered insolvent; and the transfer having been, as appellant contends, voluntary, it was fraudulent as to plaintiff, who was an existing creditor all through the fall of 1927, as well as long prior and long subsequent thereto. See 27 C. J., secs. 166, 253, pp. 502, 553. Respondent, however, not only insists that the cancelation of certificate No. 6 on November 8, 1927, was in good faith and for a valuable consideration, but asserts that most of the alleged transfers in December 1927, and all the larger ones in that month, were never effectuated, and that George B. Williams remained the exclusive owner of almost all of that stock, except the 1,350 shares, until the last of June 1929.

We have already seen that after turning the 1,350 shares back to the company, George B. Williams still had 1,238 shares. The stock book shows that on December 19, 1927, he transferred 60 shares to his son, and 60 shares to his daughter, thus reducing his holdings to 1,118 shares. On December 24, 1927, three certificates were made out: No. 21, for 550 shares, to M. Genevieve Williams, No. 22, for 275 shares, to Ward Stanley Williams, and No. 23, for 275 shares, to M. Genevieve Penrose. But on said certificate No. 21 is written, "This

certificate of stock has never been issued, never had the seal placed upon it, and never was delivered, and the same is hereby cancelled June 1, 1929." Also, on the face of said certificate No. 22 is written, "This certificate of stock has never had the seal placed on it, has never been issued or delivered, and the same is hereby cancelled June 1, 1929." Certificate No. 23 bears this annotation: "Cancelled June 29, 1929. George B. Williams." On the stub of this certificate is the following: "Transferred from George B. Williams; original number of shares 1118; number of shares transferred 275"; also this annotation: "This stock placed in escrow with Eli Cann with instructions to him to whom, when and under what conditions to deliver the same."

The trial judge concluded that George B. Williams remained the owner of said 1,100 shares (certificates 21, 22 and 23) until June 1929, and in this we cannot see that he was in error.

On June 1, 1929, Mr. Williams went to plaintiff's office and asked him to draw a will. At the same time he left with plaintiff three certificates of company stock, Nos. 23, 25 and 26, with written instructions to plaintiff, in case of Mr. William's death, to deliver No. 23 (275 shares) to Marie Genevieve Penrose, No. 25 (360 shares) to Mrs. Vernon R. Penrose, and No. 26 (468 shares) to Mrs. M. Genevieve Williams; such deliveries to be made "after the debts of my estate are paid." Plaintiff assisted Mr. Williams in the preparation of these escrow papers which, with the stock book, were left at plaintiff's office. Mr. Williams and his daughter testified that on this occasion plaintiff figured out how many shares Williams had, and informed him of the number. This plaintiff emphatically denied, but testified that Mr. Williams told him how many shares he had, and that plaintiff simply put down what Williams told him. On June 29, 1929, Williams again went to plaintiff's office, canceled said escrow, executed his will, and took away the stock certificates and stock book. On the same day he transferred 552 shares of company stock (certificate

No. 27) to M. Genevieve Penrose, and 486 shares (certificate No. 28) to M. Genevieve Williams. These transfers reduced his holdings to 80 shares, and on August 15, 1925, he transferred 75 of these to his son-in-law, Vernon Rowe Penrose, thus retaining only 5 shares himself.

The trial court held that the evidence established the ratification by the stockholders of George B. Williams's surrender of the 1,350 shares of stock for the discharge of a debt and with the view of reducing the amount and enhancing the value of the outstanding shares. Said court found that said transfer was for a valuable consideration, and without intent to defraud creditors; and that at the time of the execution sale the 1,350 shares attempted to be sold by the sheriff did not belong to said George B. Williams.

This court finds itself unable to say that any of the trial court's controlling findings or conclusions were clearly wrong. One of the chief reasons for our position is that George B. Williams was not shown to have been rendered insolvent on November 8, 1927, or at any time soon thereafter. The evidence indicates that plaintiff's claim could have been fully satisfied out of the realizable assets of George B. Williams, not only for a long time before November 8, 1927, but for a long time thereafter. Williams's debt to plaintiff was an old one. Every six months plaintiff would take a new note, for some years from Williams only, and then from both him and his wife. Thus the interest mounted higher and higher, until the original indebtedness more than doubled in amount. It was more than nineteen months after the cancelation of certificate No. 6 on November 8, 1927, before Williams disposed of practically all of the 1,118 shares he had held since December 19, 1927. Whatever question there may be concerning the validity of the transfers made by Williams to his relatives in June and August 1929 (Glenn, Law of Fraudulent Conveyances, sec. 307; 27 C. J. 495, sec. 153), it is not clear, when

all the evidence in the case is considered, that the cancelation of certificate No. 6 on November 8, 1927, was the first move in a fraudulent scheme to defeat creditors, in which the last moves were said transfers in June and August 1929.

The judgment and order appealed from are affirmed.

DUCKER, J., I concur.

COLEMAN, C. J., concurring:

It is with grave misgivings that I concur.

There are many circumstances in the case which seem to impeach three witnesses on behalf of defendant, who testified as to what transpired at a stockholders' meeting on December 3, 1927.

If the testimony of the witnesses in question is correct, the judgment should be affirmed. The plaintiff flatly contradicted the testimony in question, and it would seem improbable, as contended by counsel for plaintiff, that he would have bid the amount he did for the interest of George B. Williams in the stock in question if he had known that the stock had been turned over to the company in payment of an indebtedness. Yet it is evident that the memory of plaintiff is bad as it was proven that it was poor. This was shown with reference to a $700 payment on a note he held.

The question of the relative weight to be given to circumstantial and positive evidence is one which has long agitated courts and authors.

No hard and fast rule can be laid down as a guide in such a situation. Dean Wigmore in his excellent work on Evidence, vol. 1 (2d ed.) section 26, in dealing with this problem, states what we think is the correct view. He says: "Indeed, it can be said that there are no rules, in our system of Evidence, prescribing for the jury the precise effect of any general or special class of evidence. So far as logic and psychology assist us, their conclusions show that it is out of the question to make a general assertion ascribing greater weight to one class or

to the other.   The probative effect of one or more pieces of either sort of evidence depends upon considerations too complex.   Science can only point out that each class has its special dangers and its special advantages."

Accepting the general rule that a judgment must be affirmed, where the evidence is conflicting, provided there is substantial evidence to support it, unless the conclusion reached is clearly wrong, I am driven to the necessity of concurring in the order of affirmance.